## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **ROBERT LUITEN and** | * | |
| **LENNARD LUITEN** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **CIVIL ACTION NO.:** |
| **v.** | * | **1:18-cv-00140-WS-N** |
| | * | |
| **FAIRHOPE YACHT CLUB,** | * | |
| | * | |
| **Defendant** | * | |

## MOTION TO DISMISS WITH PREJUDICE

Defendant Fairhope Yacht Club ("FYC") moves the Court pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure* to dismiss plaintiffs' claims with prejudice for failure to state a claim upon which relief can be granted. In support, FYC shows unto the Court as follows:

## INTRODUCTION

As set out in plaintiffs' complaint (Doc. 1), this action arises from the 2015 Dauphin Island Race (the "regatta") which was hosted by FYC. Unfortunately, the regatta was marred by an unprecedented and unpredicted severe thunderstorm. Plaintiffs' complaint does not allege that FYC or any FYC race committee member owned, operated, managed, maintained, or navigated the plaintiffs' vessel during the regatta, but rather alleges that plaintiff Robert Luiten was the owner of the vessel and that plaintiff Lennard Luiten was the skipper of the vessel during the regatta.

## GOVERNING LAW

Plaintiffs have asserted general maritime law claims against FYC for negligent infliction of emotional distress, failure to provide assistance at sea, and claims for wantonness and/or gross negligence. (Doc. 1). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common law rules, modifications of those rules, and newly created rules."

*East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864-865 (1938). "Therefore, once admiralty jurisdiction is established all the substantive rules and precepts peculiar to the law of the sea become applicable; a plaintiff's case will be determined under principles of maritime negligence rather than common law negligence."[1] Schoenbaum, ADMIRALTY AND MARITIME LAW §5-2 (5th ed.2011).

For plaintiffs to succeed on any of their claims, FYC must have first owed a legal duty. To establish negligence under general maritime law, a plaintiff must assert "(1) **the defendant had a duty to protect the plaintiff from a particular injury**; (2) the defendant breached that duty; (3) **the breach actually and proximately caused the plaintiff's injury**; and (4) the plaintiff suffered actual harm." *Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012) (emphasis added). **"The existence of a legal duty is a question of law for the court; where there is no duty, there can be no negligence."** *Albert v. Hsu*, 602 So.2d 895, 897 (Ala. 1992) (emphasis added). *See also Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978) ("Whether a defendant owes a plaintiff a legal duty is a question of law").  Plaintiffs' claims for wantonness and/or gross negligence likewise require a showing of "some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm." *Lobegeiger v. Celebrity Cruises, Inc.*, 2012 A.M.C. 202, 231 (S.D. Fla. Aug. 23, 2011). Plaintiffs' claims are due to be dismissed for failure to state a claim for which relief can be granted under applicable maritime law.

## ARGUMENT

## I.   WHERE THERE IS NO DUTY, THERE CAN BE NO BREACH

---

[1] As an example, "a century ago the maritime law exchanged the common law's rule of contributory negligence for one of comparative negligence." *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001).

### A.    __Risk Creation in the Maritime Setting__

In considering whether FYC created a risk such that it owed a duty, the significance of the maritime context cannot be discounted. The marine environment is harsh and unforgiving. This reality is known to and by "they who go down to sea in ships." *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104 (1946). "From earliest times, maritime law was shaped by the practical needs of those engaged in maritime commerce. The unique character of the sea and its hazards created the need for legal solutions and doctrines that, in some cases, had no application on land." Schoenbaum, ADMIRALTY AND MARITIME LAW §1-1 (5th ed. 2011) (emphasis added). The risks associated with participation in any marine event or venture are known and apparent and have been from time immemorial.[2] These inherent risks include hazardous, and at times, unpredictable, weather conditions, strong winds, and powerful waves. By voluntarily participating in the Regatta, aboard their own vessel, the plaintiffs' exposed themselves to those inherent dangers and perils of the sea, none of which were created by FYC.

The inherent hazards and risks of the sea are well documented and are accounted for in maritime law. Cases addressing everything from seamen's remedies under the Jones Act, the carriage of passengers, the carriage of cargo, the Limitation of Liability Act, and salvage all speak to and make provisions for the "perils of the sea," defined as "[a]n action of the elements at sea having such great force as to overcome the strength of a well-founded ship and the normal precautions of good marine practice . . . Also termed danger of navigation; danger of river; marine peril; marine risk; (in regard to the Great Lakes) perils of the lakes; danger of the sea." *Black's*

---

[2] Rhodian sea codes from the eighth century speak to the issues arising from the perils of the sea including collision, sinking, salvage, cargo loss, and general average, and its origins can be traced to the Code of Hammurabi from approximately 1800 B.C. *See* Schoenbaum, ADMIRALTY AND MARITIME LAW §§ 1-2, 1-3 n. 3.

*Law Dictionary* (10th ed. 2014). "Extraordinary action of the wind and waves . . . collision, foundering, stranding, striking on rocks and icebergs, are all covered under these words ['peril of the sea']. Even a swell from a passing ship may be a 'peril of the sea.'" Grant Gilmore & Charles L. Black Jr., *The Law of Admiralty* § 2-9, at 72–73 (2d ed. 1975).

Professional seamen are constantly exposed to the "perils of the sea," and their lives have been described by courts as "**grim and dangerous,**" *Litherland v. Petrolane Offshore Const. Service, Inc.*, 546 F.2d 129, 130 (5th Cir. 1977) (emphasis added) and "**hazardous and unpredictable,**" *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 387 (1970) (emphasis added). As a result, "[s]eamen have long been characterized as 'wards of admiralty' deserving special protection under maritime law." *McBride v. Estis Well Service, LLC*, 731 F.3d 505, 517 n. 15 (5th Cir. 2013) *see also Harden v. Gordon*, 11 F. Cas. 480 (C.C.D. Me. 1823) ("Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, **exposure to perils**, and exhausting labour."); *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 727 (1943) ("From the earliest times maritime nations have recognized that **unique hazards**, emphasized by unusual tenure and control, attend the work of seamen. **The physical risks created by natural elements and the limitations of human adaptability to work at sea** enlarge the narrower and more strictly occupational hazards of sailing and operating vessels."); *Puthe v. Exxon Shipping Co.*, 2 F.3d 480, 483 (2nd Cir. 1993) ("that seamen must expect to encounter certain dangers on the job and to work during **adverse weather conditions** . . . working on deck during **high seas** and cold winds."); *Lee v. Great Lakes Dredge & Dock Co.*, 2008 A.M.C. 1, *4 (S.D.N.Y. Nov. 15, 2007) ("a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to the sea in ships are subjected . . . **inclement weather conditions, including high waves, strong winds**, snow, sleet, and cold temperatures."); *Cushwa v. Ross*, 950 F.Supp.2d 1276,

1280 (N.D. Ga. 2013) ("sea-based workers who regularly venture onto the high seas **out of sight of land and the shelter it can provide**"); and Schoenbaum, ADMIRALTY AND MARITIME LAW §6-1 ("seamen are required to endure **special perils and hardships**…the work of a seaman was difficult and extremely dangerous, requiring long stays away from home and **exposure to the perils of the sea**.") (emphasis added in all).

Similarly, in the context of the carriage of passengers and cargo, courts have recognized the unique dangers specific to maritime travel. *See Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 172 (2nd Cir. 1983) ("**the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passeng**er") (emphasis added); *Petition of Catalina Cruises, Inc.*, 930 F.Supp. 1384, 1392 (C.D. Ca. 1996) ("Such sea conditions not only created an uncomfortable ride for the passengers but also put them in a great deal of danger, especially in light of the failure to properly equip the vessel . . . increasingly dangerous winds of 30 to 35 knots and the accompanying swells of 12 to 18 feet . . . hazardous conditions of wind, seas . . . These hazards were made apparent by the shuddering crash of the huge wave which finally struck the vessel on the beam with a force that shattered the window on the main deck and exploded through the gunwales on the number one weather deck"); *Complaint of Tecomar S.A.*, 765 F.Supp. 1150, 1177 (explaining that "Beaufort Force 11 winds and Douglas Force 8 significant wave height" were expectable weather conditions in a particular part of the sea at a certain time of year); *Arbib & Houlberg v. Second Russian Ins. Co.*, 294 F. 811, 816 (2nd Cir. 1923) ("perils of the sea embrace all kinds of marine casualties, and every species of damage suffered by the ship or ship's cargo at sea, due to the extraordinary action of the wind or the waves"). Courts calculating salvage awards consider the salvor's "skill and effort" in saving the property or vessel, "**[b]ecause**

of the peculiar dangers of sea travel." *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998) (emphasis added).

### B. <u>FYC did not create a foreseeable risk towards the plaintiffs.</u>

"'It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty,'" *Thompson v. Mindis Metals, Inc.*, 692 So.2d 805, 807 (Ala. 1997) (quoting *Morton v. Prescott*, 564 So.2d 913, 915 (Ala. 1990)), because "**where there is no duty, there can be no negligence.**" *City of Bessemer v. Brantley*, 65 So.2d 160, 165 (Ala. 1953) (emphasis added). "In determining whether a duty exists in a given situation . . . courts should consider a number of factors, including public policy, social considerations, and foreseeability." *Smitherman v. McCafferty*, 622 So.2d 322, 324 (Ala. 1993) quoting 57A Am.Jur.2d *Negligence* § 87, at 143 (1989). However, "[f]oreseeability does not equate to duty." *In re Aramark Sports and Entertainment Services, LLC*, 831 F.3d 1264, 1279 (10th Cir. 2016) *citing East River Steamship Corp.*, 476 U.S. 858, 874. "[I]n a negligence case . . . the role of foreseeability should be in assessing whether a person acted with reasonable care—that is, without negligence . . . **<u>after the court has determined that there is a duty</u>**." *In re Aramark*, 831 F.3d at 1280 (emphasis added).

For FYC to have owed a duty of care to the plaintiffs at the time their vessel sank, FYC must first have created a foreseeable risk towards the plaintiffs. "[A]n actor ordinarily has a duty to exercise reasonable care **when the actor's conduct creates a risk of physical harm.**" *Restatement (Third) of Torts* § 7(a) (emphasis added). "[T]he duty of reasonable care is ordinarily limited to risks **created by the actor's conduct**. The conduct that creates the risk must be some affirmative act . . . **<u>[W]hen the only role of an actor is failing to rescue or otherwise intervene</u>** to protect another from **risks created by third persons or other events**, courts need to give

explicit consideration to the question of duty." *Restatement (Third) of Torts § 6 cmt. f.* (emphasis added).

**FYC's conduct did not create the risks of harm** that plaintiffs encountered and that ultimately caused their vessel to sink. FYC did not and cannot create the risks associated with foul weather or poor sea conditions. These hazards are inherent and peculiar to the marine environment and are present in every maritime venture. Plaintiffs' voluntarily chose to participate in a regatta. They willingly subjected themselves and their crew and passengers to the hazards and perils to which "they who go down to sea in ships are subjected," this includes the sea conditions and the weather. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104 (1946). Once aboard their own vessel in navigation, the plaintiffs were responsible for their own safety as well as that of their crew and passengers. Consequently, FYC owed no legal duty to the plaintiffs at the time their vessel sank because **FYC did not create any of the foreseeable risks** to which the plaintiffs exposed themselves and that ultimately caused their vessel to founder. Plaintiffs' complaint asks the Court to enlarge the scope of duty to include ensuring the safety of those voluntarily on the water on their own boats from the perils of the sea. FYC did not create these risks, and the concept of duty in the maritime setting should not and does not encompass risks that FYC did not create and cannot control. Plaintiffs' claims fail to state a claim upon which relief can be granted because FYC owed no duty to the plaintiffs.

**C.     Case law confirms that FYC owed no duty towards the plaintiffs.**

**1.     No duty owed by third-parties to those aboard a vessel in navigation**

Numerous courts have held that there is **no duty** towards an injured or deceased individual under circumstances similar to this case. In *Brooke v. Dennis*, 1974 A.M.C. 664 (N.D. Cal. Dec. 20, 1973), three crew members of a twenty-two foot sailing vessel, TANGERINE, were washed

overboard during a regatta. One sailor drowned and claims were brought against the vessel owner

as well as Aeolian, the sponsoring organization of the race. "The race was held under the Standard

Race Instructions of the Yacht Racing Association of San Francisco Bay (YRA) and the North

American Yacht Racing Union (NAYRU) rules." *Brooke,* 1974 A.M.C. at 665.  Regarding

Aeolian's role in the race itself the court noted:

> **Aeolian, the sponsoring organization for the race, did not, as was the custom, and as Aeolian stated in its invitation, supply patrol craft for the race, nor did Aeolian inspect each participating yacht prior to the race for safety equipment or seaworthiness, nor did it check each crew member of each yacht as to sailing competency, experience or ability. Aeolian arranged for the race, publicized it, purchased prizes, recorded the start and finish times of each yacht, and determined the winners of each class. No Aeolian officer, director or employee was physically on navigable waters of the United States before, during or after the race. Aeolian did not have management and control in navigation of the *Tangerine* or of any other participating yacht or their crews during any part of the race.**

*Brooke*, 1974 A.M.C. at 667-8  (emphasis added).

The court found that there was no jurisdiction over Aeolian pursuant to the Death on the

High Seas Act; however, the court also held that the yacht club could not be negligent for the

events that occurred to the TANGERINE's crew because **Aeolian owed no duty to the crew**:

> Aeolian committed no act that caused the death of Joe Brooke, by neglect or by default. **Aeolian, contrary to plaintiff's contention, had no duty to patrol the race, call it off once it started, inspect entered vessels, examine their crews or insist upon Coast Guard patrol. The race was run pursuant to well established rules**.
>
> \*\*\*
>
> At the conclusion of plaintiff's case…[Aeolian's] motion was taken under submission. **It is now granted, because on the facts and law the plaintiff has no right to relief against Aeolian**.

*Brooke*, 1974 A.M.C. at 671-72 (emphasis added).

Like the hosting organization in *Brooke*, the act of arranging the race, publicizing it, and

recording the start and finish times did not place a duty on FYC towards plaintiffs who, like the

decedent and crew in *Brooke*, were aboard a vessel that was not managed or controlled by any member of FYC.  Like the plaintiff in *Brooke*, plaintiffs in this case have no right of relief against FYC because their alleged damages were not caused by any act of FYC. Plaintiffs owned, operated, navigated, and maintained their own vessel, not FYC. *See also Miami Valley Broadcasting Corp. v. Lang*, 429 So.2d 1333, 1337 (Fla. 4th DCA 1983) (Applying maritime law and holding that the sponsor of boat race was not liable towards a passenger aboard one of the participant vessels because the sponsor "**was not liable for the operation of the [participant] boats.**" *Id*. The appellate court **rejected** plaintiff's argument that a sponsor organization "was **under a duty to provide adequate protection for all of the participants, spectators, and other users of the water**.") (emphasis added in all).

In *Nieto-Vincenty v. Valledor*, 22 F.Supp.3d 153, 165 (D.P.R. 2014) a passenger on a chartered vessel, SEA WATCH, was injured when the vessel sank. The injured passenger brought claims against the marina where the vessel berthed and from which it had departed. The court held that the marina owed no duty to passengers aboard the chartered SEA WATCH in the absence  of any evidence that the marina owners "(1) exercised control over the care or safety of the Sea Watch, (2) made representations about the condition of the Sea Watch or its captain, (3) acted as an agent or broker for Sea Watch Divers, or (4) engaged in a joint venture with Sea Watch Divers."). Like FYC in this case, the marina in *Valledor* "had no involvement with the ownership, maintenance, operation or navigation" of the vessel. *Id*. at 163. The court granted summary judgment in favor of the marina, holding that there was no duty owed to the plaintiffs.

*See also Travelers Indem. Co. v. Gulf Weighing Corp.*, 352 F.Supp. 335, 343 (E.D. La. 1972) (holding marina "was in no way negligent, and did not breach any duty owed to the plaintiffs. The marina exercised no control over the vessels in the area; it merely leased boat slips

to various vessel owners. **The care and safety of the vessels housed at the marina was left to the individual vessel owners**.") (emphasis added); *H.R.M., Inc. v. S/V Venture VII*, 972 F.Supp. 92 (D.R.I. 1997) (yacht club not liable to vessel owner where captain's inattentiveness was the proximate and superseding cause of the vessel breaking free from its mooring during a thunderstorm). In this case, FYC did not own and exercised no control over the plaintiffs' vessel, and, as such, FYC owed no duty to the plaintiffs.

### 2.      No duty to provide open and obvious weather information

Many of plaintiffs' allegations arise from FYC's alleged acts or omissions relating to the weather on the day of the regatta. (Doc. 1, *passim*). Numerous courts applying maritime law have held that wharfingers and marina owners owe no duty to individuals killed or injured upon navigable waters as a result of weather related casualties. Courts have held there is no duty even when the vessel departed from the defendant's facilities or was commercially rented by the defendant marina for profit. In *In re Aramark*, four people died when the rented recreational boat they were aboard sank in Lake Powell, a navigable body of water. The day before the accident, the boat owner gave the renters/operators a weather forecast at the same time they signed the rental agreement. The boat owner also informed them they would be provided with another weather forecast when they came to pick up the boat the next day. The rental vessel was equipped with a radio which allowed them to obtain weather forecasts, if it was turned on, and the proper channel was selected. When the renters/operators arrived at the marina the next day, the rental company did not provide them with an updated weather forecast; however, the renters/operators did not request an updated forecast. The rental company informed them about the vessel's onboard radio and which channel to select to receive weather forecasts. Additionally, one of the operators confirmed that he knew how to use the radio. Later in the day, the boat encountered a thunderstorm

while on Lake Powell and sank. Four of the six people aboard drowned. In applying maritime law, the Tenth Circuit held that the boat rental company had **no duty to provide customers with a weather forecast**. The court held that:

> In our view, Aramark had no duty to obtain a weather forecast and provide it to the boaters. As we noted above in the general discussion of duty, notions of personal responsibility regularly underlie no-duty determinations. **The question here is whether the defendant must protect the plaintiff against a danger not created by the defendant when the plaintiff could take the same protective steps at least equally easily and well. The rented boat was equipped with a radio for obtaining weather reports. The boaters could obtain the forecast with the same minimal effort that the Aramark representative at the marina could. Also, forecasts are notoriously iffy. The forecasts available on the boat radio during the trip would be more timely than the forecast that could be provided by the representative before the trip began. With all this in mind, it is unsurprising that every reported decision (cited to or found by us) to consider the point has held that there is no duty to acquire a weather forecast and provide it to customers**.

*In re Aramark*, 831 F.3d at 1282 (emphasis added).

The court reasoned that "**the defendant did not create the danger and had no greater capacity to learn of the danger than the injured persons did**, **particularly when one considers the advisability of getting periodic updates of the forecast. We conclude that Aramark had no duty to monitor the weather and prove a forecast to the boaters**." *In re Aramark*, 831 F.3d at 1283 (emphasis added). In this case, FYC had less involvement with the plaintiffs' vessel than the marina in *In re Aramark*. The plaintiffs' were aboard their own privately owned vessel rather than being provided one by FYC for commercial gain. In reaching its ultimate conclusion that the marina owed no duty to the decedents, the Tenth Circuit discussed and examined numerous other reported decisions holding that there is no legal obligation to provide a weather forecast, given the open and obvious nature of weather and the widespread public availability of weather forecasts. These cases are discussed below.

- 11 -

In *Leach v. Mountain Lake*, 120 F.3d 871, 873 (8th Cir. 1997) the Eighth Circuit, applying Arkansas law, held that as a matter of law, "the marina had no…duty to acquire and pass on weather information [and] that weather information is readily available to those who rent boats (should they choose to seek it), that **boaters can themselves observe weather and sea changes and ascertain water temperature, and that the ability of boaters to do this is not in any way dependent upon what marinas do or do not tell them**." *Leach*, 120 F.3d at 873 (emphasis added). The Eighth Circuit affirmed summary judgment in favor of the marina defendant. *See also Craine v. U.S.*, 722 F.2d 1523, 1525 (11th Cir. 1984) (bailor of boat had no duty to warn of dangers of operating a boat in a rapid current or near a dam); *Alberti's Adm'x v. Nash*, 282 S.W.2d 853, 855 (Ky. 1955) (bailor of boat had no duty to warn of choppy waters on lake); *Grant v. Wakeda Campground, LLC*, 631 F.Supp.2d 120, 128 (D.N.H. 2009) ("Both the inherent unreliability of weather forecasts and the fact that weather changes constantly justify **not imposing on defendant a greater duty to monitor the weather than can be expected of plaintiffs**.") (emphasis added); *Petition of Binstock*, 213 F.Supp. 909, 915 (S.D.N.Y. 1963) (prospective boat purchaser died in a storm while testing the boat; the court ruled that the seller had **no duty to warn of weather conditions when "such perils as may have existed were equally apparent to and cognizable by [purchaser and seller]"**) (emphasis added); *West v. City of St. Paul*, 936 P.2d 136, 139 (Alaska 1997) ("**Because most weather conditions are open and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers**.") (emphasis added); *Dorge v. Martin*, 905 N.E.2d 327, 332 (Ill. App. Ct. 2009) ("<u>**mere knowledge of a hazardous condition does not give rise to a duty to correct it where a defendant is not responsible for the existence of that condition** . . . just because defendant knew of the</u>

**dangerous conditions aboard a racing boat does not mean, without more, that she took on a duty of care toward plaintiff**.") (emphasis added).

Under maritime law, "wharfingers do not have a duty to warn of ordinary weather conditions because, unlike a rock or bolts hidden under the water but known to the wharfinger, **weather conditions are open and obvious and do not require a warning**." *Matter of Kindra Lake Towing, L.P.*, 2017 W.L. 4122716, *2 (N.D. Ill. Sept. 18, 2017) (emphasis added). *See also Bangor & A.R. Co. v. Ship Fernview*, 455 F.Supp. 1043, 1062 (D. Me. 1978) ("A wharfinger is under no duty to advise an approaching vessel of weather reports at the pier or of other conditions arising during the ordinary course of navigation or docking and which are readily apparent to the ship."). If wharfingers and marinas operating **commercial** facilities and vessel rental companies for profit are under no legal obligation to provide weather information to their paying customers, then FYC as a mere volunteer host for a recreational marine event should likewise have no such duty and certainly cannot have a higher duty than commercial enterprises providing facilities and vessels to mariners for profit. Holding FYC to this heightened standard would further disregard the duties owed by the owner and captain of a vessel discussed below.

Courts applying state law have held that event organizers owe no duty to spectators and participants to warn of inclement weather. In *Caldwell v. Let The Good Times Roll Festival*, 30,800 (La. App. 2 Cir. 8/25/98), 717 So. 2d 1263, 1264, *writ denied*, 98-2489 (La. 11/25/98), 729 So. 2d 566, an annual event was held inside a tent near Shreveport, Louisiana. After the event commenced, the weather worsened, and the National Weather Service issued a severe weather warning minutes later. The weather produced winds estimated to be 75 miles per hour, which caused the tent to collapse, injuring several people. The jury found for the plaintiffs at the trial level; however a Louisiana appellate court reversed and held the City of Shreveport and two co-

sponsors had neither a general nor specific duty to warn spectators of an approaching severe thunderstorm that caused injuries. The court observed that:

> Most animals, especially we who are in the higher order, do not have to be told or warned about the vagaries of the weather, that wind and clouds may produce a rainstorm; that a rainstorm and wind and rain may suddenly escalate to become more severe and dangerous to lives and property. A thundershower may suddenly become a thunderstorm with destructive wind and lightning. A thunderstorm in progress may escalate to produce either or both tornadoes and hail, or even a rare and unexpected micro burst as we have learned from this record, all of which are extremely destructive to persons and property.

*Caldwell*, 717 So. 2d at 1271.

In *Patton v. United States of Am. Rugby Football*, 851 A.2d 566 (2004), Patton, a rugby player, and his spectating father, were at an amateur rugby game when the National Weather Service issued a thunderstorm warning for the area. The referee stopped the game, but Patton and his father were next to a tree when lighting struck it, injuring Patton and killing his father. Suit was brought against the tournament organizers. The trial court, with the highest court affirming, held concerning the spectator, "[t]here is no indication from the record that decedent had entrusted himself to the control and protection of [appellees], indeed he was free to leave the tournament at any time. Additionally, there is no indication that he had lost the ability to monitor changing weather conditions and act accordingly." The highest court in Maryland continued in regards to a duty owed to a participant: "As regards Robert Patton, the Circuit Court stated that "[w]hile it is arguable that [Appellees] had a greater duty to protect plaintiff Robert Patton, a player/participant from injury, they were under no duty to protect and warn him of light[ning] strikes and other acts of nature . . . lightning is a universally known danger created by the elements" and, in the absence of evidence that Appellants created a greater hazard than brought about by natural causes, there is no duty to warn and protect."

- 14 -

The plaintiffs' voluntarily participated in this event, subjecting themselves and their crew and passengers to open and obvious perils of the sea and the weather.  FYC cannot control the waters of Mobile Bay or the weather that crosses it. These risks are inherent and are known. As such, FYC **created no foreseeable risks** and owed no duty to the plaintiffs at the time their vessel sank.[3] Plaintiffs' claims are due to be dismissed for failure to state a claim for which relief can be granted under applicable maritime law.

## II.   UNDER APPLICABLE MARITIME LAW, THE PLAINTIFFS, AS VESSEL OWNER AND SKIPPER, OWED A DUTY TO THEMSELVES AND THEIR CREW AND PASSENGERS, NOT FYC.

Longstanding maritime law precedent places duty for the safety of those aboard a vessel in navigation upon the vessel's owner and master, captain, or skipper. Maritime law should not be expanded, inconsistent with this precedent, to place a duty, greater than that of an owner or skipper, on a third-party organization volunteering to host a recreational marine event.

### A.   The obligations of a vessel owner under maritime law.

Plaintiffs' complaint alleges that plaintiff Robert Luiten was the owner of the vessel and that plaintiff Lennard Luiten was the skipper of the vessel during the regatta. Under applicable maritime law, plaintiffs were the party tasked with acting reasonably for their own safety and that of their vessel and crew. "[W]hether friend or relative, licensee or invitee, it has been held that **all visitors are owed a duty of reasonable care by the shipowner**." Schoenbaum, ADMIRALTY AND MARITIME LAW §5-5 (5th ed. 2011) at n.12 (emphasis added). "It is a settled principle of maritime law **that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel** who are not members of the crew." *Kermarec v. Compagnie Generale*

---

[3] Plaintiffs do not allege that there vessel sank during their actual participation in the regatta, but rather that it occurred "during the storm."

*Transatlantique*, 358 U.S. 625, 630 (1959) (emphasis added); *see also Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318 (11th Cir. 1989); *Pizzino v. NCL (Bahamas) Ltd.*, 2017 WL 4162194, *2 (11th Cir. Sept. 20, 2017) ("the owner of a ship in navigable waters owes passengers a duty of reasonable care under the circumstances." *citing Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1279 (11th Cir. 2015)); *In re Treanor*, 144 F.Supp.3d 381, 389 (E.D.N.Y. 2015) ("Petitioner, as the owner of the KANDI WON, owed a duty to his passengers to avoid rendering it unseaworthy by overloading it . . . Under well-established principles of Second Circuit maritime negligence law, an owner breaches his or her legal duty of reasonable care by failing to take simple precautions to prevent foreseeable and serious injury").

### B.    The obligations of a captain or skipper under maritime law.

The lack of duty owed to by plaintiffs by FYC is further evidenced by the traditional duties and obligation of the master, captain, or skipper of a vessel under maritime law.[4] FYC's hosting of the 2015 regatta does not abrogate or change longstanding maritime law that the captain or skipper of a vessel is its lord and master and thus is ultimately responsible for the welfare of the crew. "**It is a well established principle of admiralty law that a vessel skipper or captain is ultimately responsible for the safety and welfare of his crew**. **The skipper has a duty to do whatever is reasonably necessary, not only to ensure the safety of his vessel and crew**, **but also to avoid, or at least minimize, the risk of harm to others**." *Naglieri v. Bay*, 93 F.Supp.2d 170, 175 (D.C. Conn. 1999) (emphasis added and internal quotations and citations omitted). The Black's Law Dictionary definition of the "master of a ship" even speaks to the duties the master possesses: "master of a ship *Maritime law.* A commander of a merchant vessel; a captain of a ship.

---

[4] Master, captain, and skipper are used inter-changeably throughout this brief. *See* Black's Law Dictionary (10th ed. 2014): master n. 3. Someone in command of a vessel or aircraft.

**The master is responsible for the vessel's navigation and the safety and care of the crew and cargo**. Black's Law Dictionary (10th ed. 2014) (emphasis added). The legal role, authority, and obligations of the skipper of a vessel are well defined in case law:

> But navigation in these circumstances is left neither to Judges nor the Elder Brethren of Trinity House nor those who, in the garb of experts, from the security of a swivel chair now lay out the course with great conviction. '**The master is the commander of the ship— lord of his little world. He is master in every sense of the word** * * *'. *The Balsa*, 3 Cir., 10 F.2d 408, 409 [1926]. Whether he has bridge or quarterdeck to stalk, as long as he commands, he is master. It is the Master, then, who must make these decisions and who, clothed with great responsibility, enjoys the greatest and widest of good faith latitude in professional judgment.

*United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir. 1956) (emphasis added).

It is the captain or skipper of a vessel who "has a duty to exercise reasonable care and maritime skill consistent with knowledge and circumstance." *Moran Towing Corp. v. Girasol Martima SA, Inc.*, 195 F.Supp.2d 337, 344 (D. Mass. 2002) (internal quotations omitted). In *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81 (5th Cir. 1960), the Fifth Circuit reversed the lower court's ruling that an ordinary person standard of reasonableness applied to the master of a vessel. The master in *Boudoin* elected to leave his tow, a 272x72 foot barge, at a low lying pier as hurricane Audrey approached the coast of Louisiana. With regards to the duties and obligations of a master, the Fifth Circuit held:

> **First, it is the nature of the calling of the shipmaster to know of the tempestuous forces of wind and tide and seas. He has to make assessments often from confusing or inadequate facts and then translate them into effective decisions. He cannot, therefore, trust to some providential intuition. He must be informed and experienced in the critical evaluation of data.** Hence, he may not justify an erroneous judgment merely because others not similarly trained or charged with responsibility reached a like conclusion. Second, he has under his command a thing which may be the instrument of further damage— here a large cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path. **He has, therefore, a special duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others.** These two supporting reasons (and

- 17 -

others) combined to make it essential that the tug captain's action of Wednesday, June 26, be tested as that required of a prudent shipmaster.

*Boudoin.*, 281 F.2d at 84-85 (emphasis added).

The obligations and duties of a vessel's master, captain, skipper also include "**a clear duty to monitor and take into account weather conditions**." *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 748 (1st Cir. 1989) s*ee also Namoh, Ltd. v. Boston Waterboat Marina, Inc.*, 2017 WL 3913938, *7 (D. C. Mass., Sept. 7, 2017) (a master must not make a decision "which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances."); *United Fruit Co. v. Mobile Towing & Wrecking Co.*, 177 F.Supp. 297, 302 (S.D. Ala. 1959); *Union Pacific R. Co. v. Heartland Barge Management, L.L.C.*, 2006 WL 2850064, *12 (S.D. Tex., Oct. 3, 2006) (a shipmaster is "required to monitor the weather, evaluate the forecasts broadcast by the National Weather Service, and prepare its facility and the barges moored there for hazards-even calamitous floods-in every way possible.").

### C.   Maritime law should not be expanded by placing a duty on FYC greater than those owed by the vessel owner and skipper.

The plaintiffs, as owner and skipper of their own vessel, consciously and voluntarily elected to participate in the regatta, not FYC on their behalf. As noted in plaintiffs' complaint, one-hundred sixteen other skippers also made the decision to participate in the 2015 regatta on April, 25, 2015. (Doc. 1, ⁋ 13). Under applicable maritime law, the owner and skipper of the vessel owed a legal duty to those aboard their vessel, including themselves.  Placing a legal duty on a volunteer run third-party, like FYC, to ensure the seaworthiness and proper operation of a vessel they do not own, operate, crew, captain, maintain, or control disregards the duties and obligations placed on the owner and captain or skipper of a vessel by maritime law. FYC owed the plaintiffs no legal duty at the time of their vessel sank pursuant to applicable maritime law.

The undersigned has been unable to locate a reported decision holding a yacht club liable for actions or omissions occurring aboard an independently owned and operated vessel. This is consistent with the above maritime authority. All maritime voyages involve inherent risk. Maritime law recognizes and accounts for this risk by placing a legal duty of reasonable care on a vessel's owner and captain. **Placing a legal duty on FYC expands the present and longstanding state of maritime law and creates a duty where it does not currently exist**. A vessel's owner and captain are in the best and only position to insure the safety of those aboard their vessel. A handful of volunteers organizing a recreational event, who are not aboard or in any way involved in the operation, management, or navigation of the participant vessels, are not in a better or greater position than the owners and captains to insure safety of those aboard the vessels. This is why maritime law places the duty of reasonable care on a vessel's owner and captain and why it should not be expanded to place a duty on FYC in this case. A volunteer host of a recreational marine event cannot reasonably be the insurer of the safety of vessels they do not own or operate. **Maritime law cannot and should not be expanded to impose greater duties on the hosts of volunteer recreational events than are placed on the vessel owners and captains or are placed on commercial enterprises renting marine facilities and vessels for profit**. Plaintiffs' claims are due to be dismissed for failure to state a claim upon which relief can be granted under applicable maritime law.

III. **PLAINTIFFS' OTHER ALLEGED SOURCES OF DUTY: THE USCG PERMIT, RACE MANAGEMENT HANDBOOK, AND 46 USC § 2304 DO NOT ALTER GENERAL MARITIME LAW'S ALLOCATION OF DUTY TO THE VESSEL OWNER AND SKIPPER.**

Plaintiffs allege in their complaint that FYC owed a duty based on the U.S. Coast Guard's ("USCG") permit, the U.S. Sailing Association's Race Management Handbook, and 46 USC § 2304. All of plaintiffs' allegations amount to a singular argument to expand duty under maritime

law without regard to precedent or to who or what created the risk at issue. Greater duties should not be placed on a third-party volunteer organization that does not own and is in no way involved with operating, navigating, or maintaining the vessel in question.

### A.   Providing notice to the USCG of the regatta does not create a duty.

Plaintiffs allege that the United States Coast Guard's ("USCG") permit/correspondence approving the 2015 Dauphin Island Race expands and creates extra legal obligations as it relates to FYC, a volunteer host of a recreational marine event. The federal statutes and regulations relevant to the USCG's permitting process make it clear that approval of a marine event by the USCG does not alter or expand maritime law's standards for duty as they relate to those aboard vessels in navigation not operated by FYC.

The statute authorizing the USCG to issue permits for marine events is 33 USC § 1233, which states "The Commandant of the Coast Guard is authorized and empowered in his discretion to issue from time to time regulations, not contrary to law, to promote the safety of life on navigable waters during regattas or marine parades." The regulations authorized by this statute are set out in 33 CFR § 100, *et seq*. With regards to the purpose and intent of these regulations, 33 CFR § 100.01(a) states: "The purpose of the regulations in this part is [*sic*] **to provide effective control** over regattas and marine parades conducted on the navigable waters of the United States so as to insure safety of life in the regatta or marine parade area." (emphasis added). The regulations provide the **USCG** with the power they may need to control a regatta or the navigable waters around such an event so that the safety of life at sea is not threatened. The purpose of the statute and regulations are further evidenced by the definitions and requirements for submitting an application for an event to the USCG. With regards to the submission of an application for a marine event to the USCG, 33 CFR § 100.15(a) and (b) states as follows:

(a) An individual or organization planning to hold a regatta or marine parade which, by its nature, circumstances or **location**, will introduce extra or unusual hazards to the safety of life on the navigable waters of the United States, shall submit an application **to the Coast Guard District Commander having cognizance of the area where it is intended to hold such regatta or marine parade**. **Examples of conditions which are deemed to introduce extra or unusual hazards to the safety of life include** but are not limited to: An inherently hazardous competition, **the customary presence of commercial or pleasure craft in the area**, **any obstruction of navigable channel** which may reasonably be expected to result, **and the expected accumulation of spectator craft.**

(b) Where such events are to be held regularly or repeatedly in a single area by an individual or organization, the Commandant or the District Commander may, subject to conditions set from time to time by him or her, grant a permit for such series of events for a fixed period of time, not to exceed one year.

33 CFR § 100.15(a) and (b) (emphasis added).

This regulation empowers the USCG to effectively perform its patrols of the navigable waters of the U.S. by requiring a host organization to notify them as to when and where such events will take place. The regulations further allow the USCG to publicly document the locations of regattas or marine parades which are held on a recurring basis. The Dauphin Island Race is an annually conducted event, and this is acknowledged by the USCG at 33 CFR § 100.801 "Annual Marine Events in the Eight Coast Guard District." Specifically, Table 7 to 33 CFR 100.801 titled "Sector Mobile Annual and Recurring Marine Events" states as follows:

| | | |
|---|---|---|
| 10. 1 Day; Next to last or last weekend in April.................. | Dauphin Island Race/ Fairhope, Lake Forest, Mobile, and Buccaneer Yacht Clubs......................... | Mobile Bay, Mobile, AL....... | Mobile Bay, all waters of the Mobile Ship Channel between channel markers 37 & 38 thru channel markers 49 & 50, to include the entire width of the channel. |

33 CFR 100.801, Table 7, 10.

As noted in the above CFR, the regatta's annual race course crosses "**the Mobile Ship Channel** between channel markers 37 & 38 thru [*sic*] channel markers 49 & 50, to include the entire width of the channel." (emphasis added). The "conditions which . . . introduce extra or unusual hazards" to navigation in the Dauphin Island Race are the numerous recreational vessels crossing the Mobile Ship Channel where there is a "customary presence" of commercial craft. The USCG permit serves as an acknowledgment by both the USCG and FYC, that regatta participant vessels will be crossing a commercial shipping lane on the day of the event. This understanding is noted in the USCG's own regulations.

The correspondence received by FYC from the USCG, pursuant to the above regulations, is not an alteration of the foundational principles of general maritime law duty standards and does not alleviate a vessel's owner and skipper's own duty, as alleged by plaintiffs. Plaintiffs' allegations concerning the USCG permit are an expansive interpretation of a bureaucratic process intended to notify the USCG that a large number of recreational vessels will be crossing a busy commercial shipping lane on a certain date during a certain window of time. It is incorrect as a matter of law to interpret this process as something more or greater or as an expansion of traditional maritime duties, such that FYC owes a greater duty than that of the owner or captain of a vessel. This notice regulation is not intended to make a volunteer recreational regatta host a guarantor of the safety of everyone aboard a vessel in Mobile Bay on April 25, 2015 and cannot be interpreted as an expansion of traditional maritime law duty principles. It should also be noted that 33 CFR 100.801(g) states "The Patrol Commander may terminate the event or the operation of any vessel at any time it is deemed necessary for the protection of life or property." The USCG did not terminate the 2015 Dauphin Island Race.

A review of reported and unreported decisions and relevant legal authority reveals no reported decision even discussing USCG form CG-4424, much less holding that as a matter of law a sponsoring organization of a marine event should be held to a greater standard of care based on its boilerplate permitting language. The permit does not constitute an assumption of duties, or a shifting of duties from the USCG to FYC, nor does it change or expand the duties of care owned by a vessel's owner or captain. Relevant authority has held that **not even** the USCG has an **"affirmative duty to render aid to a vessel or person in distress."** *Korpi v. U.S.*, 961 F.Supp. 1335, 1346 (N.D. Ca. 1997). If the USCG is under no affirmative duty, their form CG-4424 cannot create and place an affirmative duty on FYC to protect "all the participants, spectators, and other users of the water." *Lang*, 429 So.2d at 1337.

Some guidance in the role of USCG form CG-4424 is offered in *Lang*, 429 So. 2d 1333, which discusses a Florida statute aimed at regulating regattas and marine parades. The case arose from personal injuries suffered by a passenger aboard a vessel participating in a marine race. Like the case at bar, the vessel in question was not owned, operated, or navigated by the sponsor organization. The court ruled that general maritime law applied to the case. The statute at issue, Fla. Stat. § 371.55 (1979),[5] states that the "organization sponsoring a regatta . . . shall be responsible for providing adequate protection to the participants." The plaintiff argued that this statute applied and that it meant the sponsor of the marine event was "under a duty to provide adequate protection for all of the participants." *Lang*, 429 So.2d at 1337. The court rejected plaintiff's argument, reasoning that the statute was inapplicable because it imposed a **higher standard of duty than the general maritime law**. The court found that the sponsor of the event "**was not liable for the operation of the [participant] boats.**" *Id.*

---

[5] Now renumbered as Fla. Stat. § 327.48 (1981).

In this case, plaintiffs argue that USCG form CG-4424, which includes language similar to the Florida Statute at issue in *Lang*, imposed the same type of all-encompassing duty on FYC. This argument was rejected in *Lang* and should be rejected here. The *Lang* court based its decision, in part, on the fact that <u>the sponsoring organization was not actually operating any of the participant vessels</u>. In this case, plaintiff does not allege that FYC owned, operated, managed, or navigated the vessel in question.

      **B.**    <u>**U.S. Sailing Association's Race Management Handbook**</u>

A review of relevant caselaw reveals no reported decision supporting plaintiffs' position that the U.S. Sailing Association's Race Management Handbook creates a duty different from the standards imposed by maritime law. The Race Management Handbook consists of provisions from a broadly drafted, non-binding, guidebook on racing. Plaintiffs do not reconcile their allegations arising from the Race Management Handbook with Fundamental Rule 4 of the U.S. Sailing Association's Racing Rules of Sailing, which applied to the Regatta and which states, "The responsibility for a boat's decision to participate in a race or to continue *racing* is hers alone." (emphasis in original).

      **C.**    <u>**46 USC § 2304 does not apply to the facts of this case as alleged by plaintiff.**</u>

Plaintiffs allege in Count Two of their complaint that FYC race committee members failed to provide assistance at sea in violation of 46 USC § 2304. However, a reading of the plain language of 46 USC § 2304 and a review of relevant maritime case law, displays Count Two fails to state a claim upon which relief may be granted. The relevant statutes states:

> (a)(1) A master or individual in charge of a vessel shall render assistance to any individual **found at sea in danger of being lost**, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board.
> (2) Paragraph (1) does not apply to a vessel of war or a vessel owned by the United States Government appropriated only to a public service.

(b) A master or individual violating this section shall be fined not more than $1,000, imprisoned for not more than 2 years, or both.

46 USC § 2304 (emphasis added).

The plain language of this statute makes it clear that the master of a vessel must first **find an individual at sea in distress** before the statute applies. Plaintiffs has not even plead that FYC race committee members had any actual knowledge of the whereabouts of the plaintiffs' vessel while it was in any type of distress, nor have plaintiffs alleged that the FYC committee members attempted to rescue them but failed to do so through acts of negligence. Without knowledge that an individual or a vessel is in distress and the location of said vessel or individual, 46 USC § 2304 does not apply, and plaintiffs' claims fail as a matter of law.

The threshold failure of plaintiffs' negligent failure to rescue claim is further supported by relevant maritime case law. In *Korpi v. U.S.*, 961,  F.Supp. 1335, 1346 (N.D. Ca. 1997), the court held that: "**A private party has no affirmative duty to rescue a vessel or person in distress**." (emphasis added) *citing Basic Boats, Inc. v. U.S.*, 352 F.Supp. 44, 48 (E.D.Va. 1972); *Lacey v. U.S.*, 98 F.Supp. 219, 220 (D.Mass. 1951); F*rank v. U.S.*, 250 F.2d 178, 180 (3rd Cir. 1957); and *Bunting v. U.S.*, 884 F.2d 1143, 1147 (9th Cir. 1989). This is why courts addressing negligent maritime rescue or salvage look to whether or not the actions of the rescuer or salvor were "ordinary, reasonable, and [as a] prudent individual would have acted under the circumstances," **but only _after_ the attempted rescue or salvage has begun**. 46 USC § 2303.

In  *Martinez v. Puerto Rico Marine Management, Inc.*, 755 F.Supp. 1001 (S.D. Ala 1990), the District Court for the Southern District of Alabama (Butler, J.) considered whether the captain and crew of a container ship were negligent in their attempt to rescue two shrimpers in distress. At a threshold, **the crew of the container ship was aware of the location of the distressed shrimp**

- 25 -

**boat** and eventually was alongside it and in radio contact with the shrimpers. The court found that the captain and crew of the container ship were negligent in conducting the rescue attempt during a storm, while the shrimp boat was not taking on water and negligent in their instruction to the shrimpers to abandon ship. The court examined the circumstances to determine if the position of those in distress **was worsened by the acts of the rescuers**. The *Martinez* court held that liability will be imposed in a maritime rescue situation where "the salvor, through want of due care, **has worsened the position of the victim**." *Martinez*, 755 F.Supp. at 1006 (emphasis added). *See also Grigsby v. Coastal Marine Service, Inc.*, 412 F.2d 1011, 1021 (5th Cir. 1969), *cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970); *Frank v. United States*, 250 F.2d 178 (3d Cir. 1957), *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958) (liability imposed if the person to be rescued relies on "some representation about the voluntary service" or if the attempted rescue "is so conducted that **it affirmatively injures the one in distress or worsens his position**"). FYC did not worsen the position of the plaintiffs once they were in distress because FYC had no knowledge of their distress and therefore could make no attempt to rescue them such that 46 USC § 2304 would be triggered. In this case, plaintiffs have alleged and suggested the court should apply an interpretation of 46 USC § 2304 which would expand its obligations beyond what is contemplated in the plain language of the statute. As with plaintiffs' other alleged sources of duty, the case reporters are devoid of any authority supporting plaintiffs' broad interpretation of 46 USC § 2304.

Plaintiffs' position with respect to "failure to rescue" displays complete ignorance as to the realities of the marine environment, maritime law, or even the size of Mobile Bay. Accepting plaintiffs' expansionist view of maritime duty, and of 46 USC § 2304 would create an absurd result. Such an application of the statute requiring persons to affirmatively seek out mariners

possibly in distress would create an obligation on FYC to locate and rescue every single mariner in distress on Mobile Bay simultaneously. This would even include individuals, like plaintiffs, who were not first "found at sea" by the FYC committee boat. Plaintiffs do not reconcile how the FYC committee boat in the southernmost edge of Mobile Bay during the storm was capable of rescuing every mariner in distress simultaneously.[6] Case law directly contradicts plaintiffs' asserted interpretation of this statute. "**A private party has no affirmative duty to rescue a vessel or person in distress**." *Korpi v. U.S.*, 961 F.Supp. at 1346 (emphasis added). Not even the USCG has such a broad obligation; "**[t]he Coast Guard, therefore, also has no affirmative duty to render aid to a vessel or person in distress . . . The Coast Guard is not held to any higher standard of care in its rescue operations than a private person**." *Id.* (emphasis added).[7]

46 USC § 2304 simply means that if one mariner finds another, in distress, the first mariner must assist the individual: "**found at sea in danger of being lost**." This is not what plaintiffs allege happened in this case. Plaintiffs have not alleged, because they cannot allege, that FYC knew where they were when their vessel entered a state of distress or that FYC had any direct knowledge of the distress itself. Count Two of plaintiffs' complaint is another artfully pled attempt to expand traditional maritime law duty beyond its current and well defined boundaries, and 46 USC § 2304 is not a valid legal basis of recovery in this case. As such, plaintiffs' claims for failure to provide assistance at sea fail to state a claim upon which relief can be granted.

## III.   INTERESTS OF FEDERAL UNIFORMITY

---

[6] This broad interpretation would include an obligation on the one FYC committee boat to also rescue all three of plaintiffs' counsel's decedents simultaneously as they have alleged a failure to rescue under 46 USC § 2304 as to: Robert Thomas, *Henry v. Fairhope Yacht Club* 02-cv-2016-000224; J.C Brown, *Brown v. Fairhope Yacht Club* 1:18-cv-0061-CG-MU, and Kris Beall, *Beal v. Fairhope Yacht Club*, 1:18-cv-0102-CG-N.

[7] If the USCG is held to the same standard of care as a private person, it is also unclear how their form CG-4424 would place a heightened duty obligation on FYC.

The general maritime law of the United States is guided by principles of fundamental "harmony and uniformity of the law in its international and interstate relations." *Southern Pacific Company v. Jensen*, 244 U.S. 205, 216 (1917). Furthermore, conflicts in the law "must be resolved with a healthy regard for the needs of a **uniform maritime law**." *In re Amtrak Sunset Ltd.*, 121 F.3d 1421, 1425 (11th Cir. 1997) (emphasis added). The interest of maritime law can only be protected if "all operators of vessels on navigable waters are subject to uniform rules of conduct." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982). Plaintiffs' broad interpretation of duty contradicts the interests of uniform rules and harmony in maritime law. Expanding duty in the maritime context to include protecting against the inherent perils of the sea which are not created, controlled or capable of control by FYC would be inimical to a uniform maritime law. This is especially true considering the lack of authority supporting plaintiffs' position with respect to form CG-4424, the Race Management Handbook, and 46 USC § 2304. Plaintiffs' proffered expansive view of duty unnecessarily disrupts and contradicts the larger concerns of maritime law uniformity.

## CONCLUSION

Plaintiffs voluntarily sailed in the regatta, exposing themselves, their vessel, and their crew to the known hazards and perils of the sea. FYC did not create these hazards, and had no duty to protect the plaintiffs from them. FYC did not "deprive [plaintiffs] of normal opportunities to protect [themselves]," through the act of volunteering to host a recreational regatta. *Harper v. Herman*, 499 N.W. 2d 472, 474 (Minn. 1993). Plaintiffs' position requires the Court to disregard the maritime context of this casualty, eons of maritime precedent, and the traditional duties of the owner and captain of a vessel.  For plaintiffs' claims to succeed, the Court would have to adopt and apply an enlarged scope of duty, such that third-party volunteers who do not own, are not aboard, and are not managing or navigating the vessel in question are nonetheless responsible for

PD.23494293.1

the welfare of its occupants to a greater degree than that of her owner and captain. "With the lives of their crew, and their own, hanging in the balance..." **the decisions of how to respond should be "committed irrevocably to these masters**." *United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir. 1956) (emphasis added). Traditional maritime law duty obligations are not expanded by the USCG's issuance of a permit, a non-binding guidebook, or 46 USC § 2304. Plaintiffs' expansive interpretation of duty contradicts the uniformity and harmony interests of maritime law. If events such as the Dauphin Island Race are to continue to exist, maritime law should not be expanded to impose further or greater duties where they have not historically existed.

WHEREFORE, the premises considered Fairhope Yacht Club respectfully requests that the Court dismiss plaintiffs' claims with prejudice pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure* for failure to state a claim upon which relief can be granted.

Respectfully submitted,

*s/ E. Barrett Hails*
ALLEN E. GRAHAM          (GRA051)
E. BARRETT HAILS          (HAI021)
Attorneys for Defendant Fairhope Yacht Club

OF COUNSEL:

**PHELPS DUNBAR, LLP**
101 Dauphin Street, Suite 1000
Post Office Box 2727
Mobile, Alabama  36602
(251) 432-4481
Teeto.Graham@phelps.com
Barrett.Hails@phelps.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have on April 16, 2018 served a true and correct copy of the foregoing on the following parties by electronic filing through the CM/ECF filing system, to wit:

James J. Crongeyer, Jr.                    H. Lanier Brown II

H. Ruston Comley
WATKINS & EAGER, PLLC
Post Office Box 650
Jackson, Mississippi 39205

Omar L. Nelson
Gibbs Travis PLLC
1400 Meadowbrook Road, Suite 100
Jackson, Mississippi 39211

WATKINS & EAGER, PLLC
Lakeshore Park Plaza
2204 Lakeshore Dr., Suite 114
Birmingham, Alabama 35209

*s/ E. Barrett Hails*
ALLEN E. GRAHAM
E. BARRETT HAILS

- 30 -